IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | : : : | |
| Plaintiff, | : : | CIVIL ACTION NO. |
| v. | : : | JURY TRIAL DEMANDED |
| LIFE UNIVERSITY, INC. | : : | |
| Defendant. | : : : | |

# **COMPLAINT**

This is an action under Title VII of the Civil Rights Act of 1964 ("Title VII") as amended, and Title I of the Civil Rights Act of 1991 to correct unlawful employment practices on the basis of race and retaliation and to provide appropriate relief to Channon Williams ("Williams") and Shaundy Thomas ("Thomas"), who were adversely affected by such practices. The Equal Employment Opportunity Commission ("EEOC") alleges that Defendant, Life University, Inc. ("Defendant"), subjected Williams and Thomas to different terms and conditions of employment on the basis of their race, African American, in violation of Title VII. The EEOC further alleges that, after Williams and Thomas

complained about the disparate treatment, Defendant terminated their employment, also in violation of Title VII.

## JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343, and 1345. This action is authorized and instituted pursuant to Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5(f)(1) and (3) ("Title VII") and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2. The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the Northern District of Georgia, Atlanta Division.

## PARTIES

3. Plaintiff, the Equal Employment Opportunity Commission (the "Commission"), is the agency of the United States of America charged with the administration, interpretation, and enforcement of Title VII and is expressly authorized to bring this action by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1) and (3).

4. At all relevant times, Defendant has continuously been a corporation doing business in the state of Georgia and the city of Marietta, and has continuously had at least 15 employees.

5. At all relevant times, Defendant has continuously been an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

## ADMINISTRATIVE PROCEDURES

6. More than thirty days prior to the institution of this lawsuit, each Claimant filed a charge of discrimination with the Commission alleging violations of Title VII by Defendant.

7. On March 8, 2017, the Commission issued to Defendant Letters of Determination finding reasonable cause to believe that Title VII was violated and inviting Defendant to join with the Commission in informal methods of conciliation to endeavor to eliminate the unlawful employment practices and provide appropriate relief.

8. On April 19, 2017, the Commission issued to Defendant Notices of Failure of Conciliation advising Defendant that the Commission was unable to secure from Defendant a conciliation agreement acceptable to the Commission.

9. All conditions precedent to the initiation of this lawsuit have been fulfilled.

## STATEMENT OF CLAIMS

10. Since at least June 2015, Defendant has engaged in unlawful employment practices at its Marietta, Georgia campus in violation of Sections

703(a) and 704(a) of Title VII, 42 U.S.C. §§ 2000e-2(a) and 2000e-3 by subjecting Williams and Thomas to different terms and conditions of employment on the basis of their race, African American, and by terminating their employment based on retaliation after each complained about the disparate treatment.

11. Channon Williams and Shaundy Thomas are African American females. Thomas was hired by Defendant in November 2010 as a Financial Aid Counselor. Williams was hired by Defendant in July 2012 as a Financial Aid Counselor.

12. Melissa Waters ("Waters"), a Caucasian female, was the Director of Financial Aid and supervised all of the Financial Aid Counselors.

13. Since at least June 2015, Waters began treating the Caucasian financial aid counselors more favorably than Williams and Thomas.

14. Since at least June 2015, Waters subjected Williams to disparate treatment in the form of discipline when she continuously chastised Williams who is African American, for allegedly being tardy to work but failed to discipline a similarly situated Caucasian financial aid counselor who had worse attendance issues.

15. In or around August 2014, Waters became aware of Williams' family medical situation that, on occasion, prevented Williams from arriving to work on time. Therefore, Waters informally allowed Williams some flexibility in arriving

to work if Williams made up her time and completed an 8-hour work day. Williams' work day began at 8:00 a.m.

16. Waters allowed all financial aid counselors a 10-minute grace period when arriving to work. However, in or about June 2015, Waters issued Williams a written warning on June 29, 2015, for arriving approximately 10 minutes late to work, despite the 10-minute grace period.

17. On July 10, 2015, Waters issued Williams another written warning for being tardy to work.

18. In or around July 2015, Williams filed an internal grievance with Defendant's Employee Relations Officer/Ombudsman, alleging that Waters was discriminating against her based on race by subjecting her to written discipline for alleged attendance issues while not disciplining a Caucasian financial aid counselor who had a reputation for having chronic attendance issues.

19. Shortly after contacting Defendant's Employee Relations Officer, Williams met with the officer and Waters. During this July 2015, meeting, Williams explained that Waters' unfair treatment was negatively impacting her work performance. Williams also told Waters about her concern that she was being targeted for termination.

20. After this meeting, Waters continued to scrutinize Williams' time. When Williams returned from the restroom, her co-workers would tell her that

5

Waters was looking for her. When Williams called Waters to ask what she needed, Waters would make up an excuse to support her reason for inquiring about Williams' whereabouts.

21. Waters was not, however, scrutinizing the time and checking on the whereabouts of a Caucasian financial aid counselor although it was well-known in the office that she routinely came to work late, missed student appointments, left during the middle of the day for hours at a time, and simply failed to show up for work.

22. Williams continued to complain to Defendant's Employee Relations Officer about Waters' discriminatory treatment.

23. Therefore, beginning in August 2015, the Employee Relations Officer facilitated three more meetings between Williams and Waters in an effort to resolve their issues.

24. During the first meeting in or about early August 2015, Waters denied treating Williams unfairly, but agreed to allow Williams to change her work day start time to 8:15 a.m. in addition to the 10-minute grace period granted to all financial aid counselors.

25. During the second meeting with Williams and the Employee Relations Officer, Waters commended Williams for her attendance and arriving to work on

time. Thereafter, instead of focusing on Williams' time, Waters began overly scrutinizing Williams' work product.

26. At or about the end of August 2015, Williams, Waters, and Defendant's Employee Relations Officer met for a third time. During this meeting, Williams again expressed her concern that Waters was treating her disparately as compared to a Caucasian financial aid counselor with known attendance and performance issues.

27. After the third meeting in late August 2015, Williams continued to complain to Defendant's Employee Relations Officer about Waters' discriminatory treatment through December 2015.

28. In or around the beginning of December 2015, after months of making informal complaints to Defendant's Employee Relations Officer about Waters, Williams formalized her complaint of discrimination against Waters with Defendant.

29. On January 12, 2016, Waters issued Williams a final written warning for allegedly arriving late to work on several days during the first two weeks in January 2016.

30. On January 15, 2015, Waters terminated Williams for arriving 4 minutes late to work on a day with inclement weather.

31. On January 19, 2016, Williams filed a formal appeal of her termination with Defendant's Human Resources Department. In her appeal, Williams stated that because she had a 10-minute grace period that was allowed to all financial aid counselors, in addition to her 8:15 a.m. start time, she was not late to work on the days that Waters had written her up. Williams further stated that she had arrived to work on time on the day that she was discharged, but could not enter the building until 8:04 a.m. when security let her into the office, because of a broken lock.

32. Nonetheless, Williams' termination was upheld by Defendant on January 25, 2016.

33. Since at least August 2015, Waters subjected Thomas to disparate treatment in the form of discipline when she reprimanded Thomas for alleged performance issues while she did not discipline similarly situated Caucasian financial aid counselors for the same or similar performance issues.

34. On or about August 5, 2015, Thomas filed an internal complaint with Defendant's Employee Relations Officer, claiming that Waters treated her and Williams less favorably than she treated their Caucasian co-workers.

35. Specifically, Thomas complained that Waters disciplined Williams for alleged attendance issues while she failed to discipline a similarly situated Caucasian financial aid counselor with a worse attendance record.

36. Thomas also stated in her complaint that Waters gave preferential treatment to the Caucasian financial aid counselors and placed one of them in charge of the office when Waters was on leave, although she had the least seniority in the department.

37. Soon after Thomas made her complaint against Waters, Waters began to overly scrutinize Thomas' work and bombard her with emails about alleged mistakes.

38. In early January 2016, Thomas and Williams had a meeting with Waters where they expressed their concerns that they were being targeted and micromanaged by Waters while their Caucasian co-workers were not being subjected to the same treatment.

39. Shortly after the meeting, on or about January 8, 2016, Thomas complained again to Defendant's Employee Relations Officer that Waters was targeting her, accusing her of errors that she had, in fact, not made, and sending her rude emails. Thomas complained that Waters criticized her in meetings and then praised her Caucasian co-workers and encouraged everyone to be like them. Thomas explained that she wanted her complaints to be documented but needed another week to decide if she was going to formally file a complaint.

40. About one week later, on or about January 15, 2016, Waters terminated Thomas on the same day that Williams was terminated.

41. During the termination meeting with Waters, Thomas was handed a document which stated that her termination was based on multiple errors in her work that occurred during the week of January 4 – January 8, 2016. In addition, Waters informed Thomas that she had audited Thomas' new student accounts during the following week of January 11 – January 13, 2016 and found additional errors.

42. On January 19, 2016, Thomas filed a formal appeal of her termination with Defendant's Human Resources Department. In her appeal, Thomas disputed Waters' contention that she had multiple errors in her work during that time frame. Thomas also stated that Waters only brought one potential problem to her attention and, upon investigation, the error was caused by another department unrelated to Thomas.

43. Thomas' termination was upheld by Defendant on January 26, 2016, although Thomas had no on-going history of performance problems.

44. Defendant's termination of Williams and Thomas constituted unlawful retaliation due to their complaints of race discrimination.

45. The effect of the practice(s) complained of in paragraphs 11 through 44 above has been to deprive Williams and Thomas of equal employment opportunities and, otherwise, adversely affect their status as employees because of their race, African American and because they engaged in protected activity.

46. The unlawful employment practices complained of in paragraphs 11 through 44 above were intentional.

47. The unlawful employment practices complained of in paragraphs 11 through 44 above were done with malice or with reckless indifference to the federally protected rights of Williams and Thomas.

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

A. Grant a permanent injunction enjoining Defendant, its officers, successors, assigns and all other persons in active concert or participation with it, from engaging in race discrimination and retaliation against its employees, and/or engaging in any other employment practices that discriminate on the basis of race, or retaliates against employees who engage in protected activity.

B. Order Defendant to institute and carry out policies, practices, and programs which provide equal employment opportunities for African American employees and employees who engage in protected activity, and which eradicate the effects of its past and present unlawful employment practices.

C. Order Defendant to make Williams and Thomas whole by providing appropriate back pay with pre-judgment interest, in amounts to be determined at trial, front pay and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices.

D.   Order Defendant to make Williams and Thomas whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, in amounts to be determined at trial.

E.   Order Defendant to make Thomas and Williams whole by providing compensation for past and future non-pecuniary losses resulting from the unlawful employment practices described above, including emotional pain and suffering, loss of enjoyment of life, inconvenience, anxiety, stress, and humiliation, in amounts to be determined at trial.

F.   Order Defendant to pay punitive damages to Thomas and Williams for Defendant's malicious and/or reckless conduct as described above, in amounts to be determined at trial.

G.   Grant such further relief as the Court deems necessary and proper in the public interest.

H.   Award the Commission its costs in this action.

## JURY TRIAL DEMAND

The Commission requests a jury trial on all questions of fact raised by its Complaint.

Respectfully submitted,

JAMES L. LEE
Acting General Counsel

GWENDOLYN YOUNG REAMS
Associate General Counsel

ANTONETTE SEWELL
Regional Attorney

LAKISHA DUCKETT ZIMBABWE
Supervisory Trial Attorney


s/Ottrell Ferrell Edwards
Senior Trial Attorney
Georgia Bar No. 141979
ottrell.edwards@eeoc.gov

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
Atlanta District Office
100 Alabama St., SW, Suite 4R30
Atlanta, Georgia 30303
(404) 562-6812 (direct)
(404) 562-6905 (facsimile)